UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x

NANCI FELDMAN,                                    Case No.  *07·cv·06337*

                              Plaintiff,

              vs.
                                                  Complaint
                                                  Jury Trial Demanded

BOLIVIAN INVESTORS GROUP, INC.,

                              Defendant.

————————————————————————x


Plaintiff NANCI FELDMAN ("FELDMAN" or Plaintiff), by her attorneys MOSS &
MOSS LLP, for her Complaint against Defendant BOLIVIAN INVESTORS GROUP,
INC. ("BIG" or Defendant), et al., respectfully alleges as follows:

### Nature of the Action and Jurisdiction

1.  This is a civil action brought pursuant to the Fair Labor Standards Act ("FLSA"),
    29 U.S.C. § 201 *et seq.*, specifically §§ 206, 215 and 216 and the New York
    Labor Law ("NYLL") §§ 2, 190, 191.1.a, 191.1.c, 191.1.d, 191.2, 191.3, 191-a,
    191-b, 191-c, 198, 198-c. and §§ 650 *et seq.* This Complaint alleges that Plaintiff
    is entitled to unpaid minimum wages from Defendant for her work under the
    FLSA and/or the NYLL, unpaid wages in excess of the unpaid minimum wages,
    unpaid commissions under NYLL, unpaid wage supplements under the NYLL,
    liquidated damages under the FLSA and/or the NYLL, an accounting for
    commissions due and unpaid under the NYLL, costs, disbursements and
    reasonable attorneys' fees under the FLSA and/or the NYLL.

2.  Jurisdiction of this Court in invoked under the following statutes:

    a.  Section 201 *et seq.* of the FLSA, 29 U.S.C. §§ 201 *et seq.*;

    b.  28 U.S.C. § 1331 (federal question);

    c.  28 U.S.C. § 1332 (diversity);

    d.  28 U.S.C. § 1337 (civil actions arising under Act of Congress regulating
        commerce); and,

    e.  Principles of pendent jurisdiction (28 U.S.C. §§ 1367).

3.    Venue is proper under 28 U.S.C. § 1391(a).

**Parties**

4.    Plaintiff is an adult individual residing in New York, New York, County of New York.

5.    Upon information and belief, Defendant is a foreign corporation with its principal place of business at 2145 Pulaski Highway, Havre de Grace, Maryland 21078 with an office/showroom at 320 Fifth Avenue, Suite 507, New York, New York 10001.

**Statement of Facts**

6.    Plaintiff was hired by J.P.Ourse & Cie in 1995 as its primary salesperson.

7.    Plaintiff was, pursuant to an agreement with J.P. Ourse & Cie memorialized in a writing dated August 8, 1997, provided a base salary of $155.00 per day for a four day week, commissions of five percent (5%) on both wholesale and retail sales, paid vacation days and health insurance, and had earnings reported on a Form W-2. (Exhibit A)

8.    Plaintiff was employed as a commissioned salesperson, was the only employee in the New York showroom, and was responsible for generating approximately seventy-five percent of the company's annual sales for the duration of her employment.

9.    By an agreement dated January 28, 2005, the assets of J.P.Ourse & Cie were acquired by Defendant.

10.    The asset purchase agreement between Defendant and J.P.Ourse & Cie in paragraph "I(A)", as part of the consideration therefore, transferred all accounts receivable to Defendant. (Exhibit B)

11.    The asset purchase agreement between Defendant and J.P.Ourse & Cie in paragraph "I(D)", as part of the consideration therefore, recognized that J.P.Ourse & Cie "owes a substantial amount to [Plaintiff] and agrees to work with [Plaintiff] to address the obligation to her in a mutually agreeable manner."

12.    Plaintiff earned but was not paid approximately $90,535.00 in commissions for the period from May 2000 to July 2005, according to an aging report attached to the Purchase Agreement.

13.    Defendant acknowledged the earned but unpaid commissions and treated same as a single and unified contractual debt due under the asset purchase agreement, in which document the total debt is referred to as a single "obligation".

14. Upon information and belief, Defendant began operating J.P.Ourse & Cie in approximately October of 2005.

15. On or about September 22, 2005, Plaintiff received payment for her salary only for the period of July 2005 from J.P. Ourse & Cie, which represented the last payment made to Plaintiff by J.P.Ourse & Cie prior to Defendant commencing its operations of the company.

16. Defendant continued Plaintiff's employment and began paying Plaintiff in October of 2005.

17. Defendant paid Plaintiff for the first time on or about October 10, 2005 for salary and commissions due and owing for the month of August 2005 and salary only for September 2005.

18. Defendant paid Plaintiff the same amounts in wages and percentage of commission as did J.P.Ourse & Cie, but unilaterally ceased to make standard payroll deductions as of the check issued on October 10, 2005.

19. On or about November 14, 2005 Plaintiff and Defendant met and Defendant verbally sought to restructure Plaintiff's compensation refusing to pay her salary and benefits, including health insurance and vacation. Defendant addressed its contractual obligation to Plaintiff for the earned but unpaid commissions by proposing an additional two percent (2%) commission on limited accounts for a maximum period of four (4) years.

20. Plaintiff requested at the meeting that the Defendant's proposal be reduced to writing so as to evaluate it in full and reiterated such request several times thereafter via e-mail.

21. On or about November 30, 2005 Plaintiff received a written compensation proposal from Defendant codifying the November 14th proposal, which eliminated Plaintiff's salary, vacation days, health insurance, limited the accounts for which commissions were to be paid and proposed an additional two percent (2%) commission on limited accounts for a period of four (4) years to pay the previously earned but unpaid commissions as stated in the purchase agreement and converted Plaintiff to a 1099 employee without terminating her existing employment agreement, altering her job description or changing her responsibilities. (Exhibit C)

22. Defendant provided Plaintiff with eight (8) hours from the time of receipt of the above written compensation proposal for Plaintiff to agree to same terms, and stated that failure to respond to same proposal would be considered withdrawal of employment by Plaintiff.

23. Based on Plaintiff's knowledge of the demand for the products of J.P.Ourse & Cie and the company's maximum production capacity, Plaintiff's reasonable projected expectation of sales would result in a maximum of $40,000.00, an

amount equal to less than half the total obligation already earned, and said reduced amount would be paid out over the course of four years. In addition, such arrangement would require Plaintiff's remaining in the employ of Defendant as a prerequisite for receiving moneys already earned and such payment amounts were not guaranteed. Furthermore, Plaintiff was an at-will employee and could be terminated at any time by Defendant.

24.    Defendant did not terminate Plaintiff and Plaintiff continued to perform services for Defendant.

25.    Defendant, on or about December 12, 2005, paid Plaintiff eighteen (18) days worth of salary for November 2005 and arbitrarily and unilaterally ceased to compensate Plaintiff in any manner thereafter.

26.    On or about December 19, 2005 Plaintiff submitted a letter stating that she had been constructively discharged and ceased thereafter to perform any services for Defendant. (Exhibit D)

27.    Plaintiff obtained orders which Plaintiff believes would have generated an estimated minimum amount of $14,000.00 in commissions earned between November 2005 and May 2006 but has received no report from Defendant to be able to determine the extent of the orders shipped for which commissions would be due.

28.    Plaintiff earned but has not been paid approximately $1,240.00 in salary in December 2005.

29.    Plaintiff received no payments for her health insurance coverage after November 2005 for which $1,645.00 is due.

30.    Plaintiff received no compensation for accrued but unpaid vacation days in the approximate amount of $620.00.

**As and for a First Claim for Relief Under the FLSA –**
**Minimum Wage Provisions**

31.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 30 of this Complaint as if fully set forth herein.

32.    At all times relevant to this action, Plaintiff was engaged in commerce and/or in the production of goods for commerce and/or Defendant was an enterprise engaged in commerce and/or the production of goods for commerce within the meaning of § 206(a) of the FLSA.

33.    Defendant willfully failed to pay Plaintiff the applicable minimum hourly rate in violation of § 206(a) of the FLSA for the month of December 2005.

34.    By reason of Defendant's FLSA violations, Plaintiff is entitled to recover from Defendant, her unpaid minimum wages, an additional amount as liquidated damages, reasonable attorneys' fees and costs and disbursements of this action pursuant to 29 U.S.C. § 216 (b).

### As and for a Second Claim for Relief under New York State Labor Law – Minimum Wage Provisions

35.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 34 of this Complaint as if fully set forth herein.

36.    At all times relevant to this action Plaintiff was employed by Defendant within the meaning of the New York Labor Law §§ 2 and 651.

37.    Defendant willfully violated Plaintiff's rights by failing to pay Plaintiff at the applicable minimum hourly wage in violation of NYLL § 652.

38.    By reason of Defendant's NYLL violations, Plaintiff is entitled to recover from Defendant, her unpaid minimum wages, an additional amount in liquidated damages, reasonable attorneys' fees and cost of this action pursuant to §§ 198.1, 198.1-a and 198.2.

### As and for a Third Claim for Relief under New York State Labor Law – Payment of Wages

39.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 38 of this Complaint as if fully set forth herein.

40.    Defendant permitted Plaintiff to work subsequent to November of 2005.

41.    Plaintiff did not cancel or otherwise repudiate the contract of employment memorialized in a writing dated August 8, 1997.

42.    Plaintiff worked for Defendant until on or about December 19, 2005 earning wages as defined in NYLL § 190.1 but received no compensation subsequent to November 30, 2005.

43.    Pursuant to NYLL § 191.1.d., Defendant was obligated to pay Plaintiff was Defendant not less frequently than semi-monthly.

44.    Defendant did not pay Plaintiff after November 30, 2005.

45.    Plaintiff is entitled to recover from Defendant unpaid wages, costs of this action, disbursements, reasonable attorneys' fees and liquidated damages pursuant to §§ 198.1, 198.1-a and 198.2.

**As and for a Fourth Claim for Relief under New York State Labor Law –**
**Earned but Unpaid Commissions as an Commissioned Salesman**

46.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 45 of this Complaint as if fully set forth herein.

47.    Pursuant to NYLL § 191.1.c. and the terms of employment memorialized in a writing dated August 8, 1997, Defendant earned commissions for sales made prior to August 2005 which remain unpaid.

48.    The asset purchase agreement between Defendant and J.P.Ourse & Cie in paragraph "I(A)", as part of the consideration therefore, transferred all accounts receivable to Defendant.

49.    Pursuant to NYLL § 191.1-c., Defendant is required pay commissions earned monthly based upon a statement from which those commissions are determined.

50.    No such commission statements or payments representing sales made by Plaintiff were ever presented to Plaintiff.

51.    As a result of sales made subsequent to October 2005, Plaintiff has reason to believe additional commissions are due and owing.

52.    Defendant's NYLL violations have caused Plaintiff irreparable harm for which there is no adequate remedy at law.

53.    By reason of Defendant's NYLL violations, Plaintiff is entitled to demand an Order directing Defendant to permit and cooperate with Plaintiff in the conduct of an audit of their books and records for sales made prior to December 19, 2005 for shipping through May 31, 2006 and to pay amounts determined by the audits to be due and owing through the date of judgment as provided in NYLL §§ 198.1. 198.1-c and 191.2.

**As and for a Fifth Claim for Relief under New York State Labor Law –**
**Earned but Unpaid Commissions as a Sales Representative**

54.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 53 of this Complaint as if fully set forth herein.

55.    In the alternative, if, in November of 2005 Defendant repudiated the agreement dated August 8, 1997 and continued to employ Plaintiff as a commissioned sales representative, pursuant to NYLL § 191-b Defendant was required to set forth the method by which the commission is to be computed and paid in the form of a written signed contract which commissions must be paid no later than five (5) business days after the commissions are earned.

56.    No such contract was ever presented to Plaintiff.

57. As a result of sales made by Plaintiff, has reason to believe additional commissions are due and owing.

58. Although duly demanded, Defendant has failed and refused to provide to Plaintiff a statement of earnings due and unpaid.

59. Defendant's NYLL violations have caused Plaintiff irreparable harm for which there is no adequate remedy at law.

60. By reason of Defendant's NYLL violations, Plaintiff is entitled to demand an Order directing Defendant to permit and cooperate with Plaintiff in the conduct of an audit of their books and records for sales made from November 1, 2005 to May 31, 2006 and to pay amounts determined by the audits to be due and owing through the date of judgment plus double liquidated damages as provided in NYLL § 191-c.3.

**As and for a Sixth Claim for Relief under New York State Labor Law –
Failure to Pay Benefits or Wage Supplements**

61. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 60 of this Complaint as if fully set forth herein.

62. Pursuant to NYLL § 190.1 wages includes benefits and wage supplements.

63. The agreement dated August 8, 1997 provided for reimbursement for paid health insurance and for three (3) weeks paid vacation per year.

64. No such reimbursement for health insurance was received by Defendant from Plaintiff for the period from October to December 2005.

65. No amount for accrued but untaken vacation was paid to Plaintiff upon her leaving the employ of Defendant.

66. By reason of Defendant's NYLL § 198-c, Plaintiff is entitled to reimbursement for such health insurance in the amount of $1,645.25 and for accrued but untaken vacation in the amount of $620.00.

**WHEREFORE,** Plaintiff demand judgment against Defendant:

(a) for payment of all past due wages in an amount to be determined but in no event less than $1,240.00.

(b) for payment of all past due commissions in an amount to be determined but in no event less than $90,535.00 plus all amounts found to be due and owing pursuant to an audit of Defendant's books and records for the period November 1, 2005 to the date of the judgment;

(c)    for payment of unreimbursed health insurance costs in the amount of $1,645.25 and for accrued, untaken and unpaid vacation pay in the amount of $620.00.

(d)    for accrued prejudgment interest on all amounts of wages and commissions due;

(e)    for liquidated damages pursuant to statute on all wages due under the FLSA;

(f)    for liquidated damages pursuant to statute on all commissions due under the NYLL;

(g)    for reasonable attorney's fees, costs and disbursements pursuant to the FLSA and NYLL;

(h)    for an Order requiring the Defendant to permit and cooperate in the conduct of an audit of Defendant's books and records for the period November 1, 2005 to date of the judgment;

(i)    for payment of the costs of the audit of Defendant's books and records for the period November 1 2005 to date; and,

(j)    for such other relief as the Court deems just and proper.


Dated: New York, New York
    July 11, 2007

                MOSS& MOSS LLP
                Attorneys for Plaintiff


                By:

                  Donald C. Moss
                  (DCM 1946)
                127 East 26th Street
                New York, New York 10010
                (212) 644 1000

**EXHIBIT A**

*FAX TRANSMISSION*

**OURSE (USA) Inc.**
12196 SW 128 Street
Miami, FL 33186
Web Site:www.jpourse.com

Tel: 305.234.9000
Fax: 305.234.9097
e-mail: maxwill@jpourse.com
Toll Free: 1.800.232.7748

August 8th, 1997

| | |
|---|---|
| **To:** | **Nanci Feldman** |
| **Firm:** | **Ourse New York** |
| **From:** | **Maxine Williams** |
| **Re:** | **Compensation** |
| **Pgs:** | **1 of 1** |

Dear Nanci:

As we agreed upon, your compensation package is as follows:

1. 5% sales commissions on all wholesale accounts that you manage and sell to
2. 5% sales commissions on Ourse web retail sales generated off the web site
3. A daily rate of $155 / day for performing daily duties in the showroom and web maintenance
4. Paid health insurance of your choice
5. 3 weeks paid vacation per year

Salary will be paid on the last day of each month.
Commissions will be paid on the 25th of the month following the orders shipped.

This compensation will be effective immediately.

Very truly yours,

Maxine Williams
President

**EXHIBIT B**

## AGREEMENT FOR SALE OF ASSETS OF OURSE (USA), INC.

## TO BOLIVIAN INVESTORS GROUP, INC.

THIS AGREEMENT is entered into this __*28th*__ day of January 2005 by and between BOLIVIAN INVESTORS GROUP, INC., a Maryland Corporation, with its address at 2145 Pulaski Highway, Havre de Grace, Maryland 21078, duly represented by its authorized officer John C. Bays (hereinafter B.I.G. ) and Ourse (USA), Inc., a Florida Corporation, with its address at 14808 S.W. 136th Street, Miami, Florida, jointly represented by its President, Maxine Williams, and its Vice-President, Marcelo Vasquez (hereinafter OURSE ).

Whereas, OURSE has suffered from liquidity problems and has been unable to source product in a timely fashion in order to meet clients orders; and

Whereas, the failure of OURSE to timely ship client orders has resulted in a loss of business, a reduction in sales levels and has caused OURSE to mount operating losses threatening the existence and viability of the enterprise; and

Whereas, Maxine Williams in representation of OURSE has sought to sell the company to cover the payment of liabilities and/or attract adequate capital to properly restructure operations; and

Whereas, BAHIA *BIG* has expressed an interest in acquiring the assets of OURSE;

**NOW THEREFORE;**

**I. CONSIDERATION - (A)** In and for the consideration of the assumption of the obligations set forth herein, B.I.G. does hereby agree to acquire all assets of OURSE and OURSE does agree to transfer to B.I.G. all of the same which include, but are not limited to, the following:

- Bank Accounts
- Inventories
- Accounts Receivable
- Open Orders and Client Lists
- Furniture and Equipment (including all computers, software, books, inventory racks, etc.)
- Trademarks, Logos, Slogans and Emblems,

And any and all assets otherwise pertaining to OURSE as demonstrated on the company s books of account, titles and records of any nature whatsoever and wherever located. This clause is subject to the specific rejections permitted by B.I.G. pursuant to section II of this Agreement.

1 of 6

**(B)(1)** B.I.G., as its consideration for the transfer of all assets of OURSE to B.I.G. ownership, does hereby agree to assume the payment of the following credit card obligations in the stated amount of $64,506.66 as of January 21, 2005, plus accrued and accruing interest thereon:

- American Express 3725 24147 01011
- NFIE 5490 3536 8301 1034
- MHNA 5747 1500 0118 5031
- Bank One 4246 3119 0461 1701
- Bank of America 4339 9300 0259 0505
- Bank of America 4339 9300 0245 5766
- Bank of America 4339 9300 0259 0471
- Citi 5588 0000 0086 9809
- American Express 3783 488005 32001
- AMEX Capital Line 3722 812045 42001

**(2)** B.I.G. hereby agrees to indemnify and hold harmless Maxine Williams and Marcelo Vasquez for all personal liability for any and all of the above listed debts.

**(C)(1).** Additionally, B.I.G. does hereby agree to assume the payment of the Bank of America Credit Line (hereinafter BOALC ) stated in the amount of $49,895.66 as of January 21, 2005, plus accrued and accruing interest thereon.

**(2)** B.I.G. hereby agrees to indemnify and hold harmless Maxine Williams and Marcelo Vasquez for all personal liability they may have concerning the BOACL.



**(D** B.I.G. further recognizes that OURSE owes a substantial amount to Nanci Feldman and agrees to work with Nanci to address the obligation to her in a mutually agreeable manner. Likewise OURSE has account balances with certain vendors that may be of interest to B.I.G. in working with them for future operations. B.I.G. agrees to work with those vendors in order to address their outstanding balances.

## II. REJECTION OF OTHER OBLIGATIONS - B.I.G. specifically rejects any other obligations of OURSE not listed in this Agreement, and further states that the lease obligation to Lanier World Wide for the photocopier/printer is specifically rejected and that B.I.G. will assume no future liability for said lease agreement. Furthermore, although B.I.G. may elect to accept an assignment of the real property lease agreement entered into between OURSE and MUNIZ ALBA ENTERPRISES, INC. for the premises at 14808 S.W. 136th Street, Miami, Florida, nothing in this Agreement shall be construed as an acceptance by B.I.G. of said obligation and B.I.G. shall be free to negotiate the terms of any such assignment directly with MUNIZ ALBA ENTERPRISES, INC.

**III. FUTURE ACQUISITIONS** - Nothing herein precludes B.I.G. from acquiring rights related to other obligations of OURSE and enforcing the same against OURSE in the future.

**IV. EXPRESS CONDITIONS** - It is expressly agreed by B.I.G. and OURSE that this Agreement shall be effective only upon the following conditions occurring:

1. The shareholders of OURSE must approve this agreement within sixty (60) days of the date of this agreement for it to be effective and the transfer of assets to occur.

2. The shareholders of Mara Holdings Overseas LTD (a British Virgin Islands corporation) must approve this agreement (as Mara Holdings Overseas is the sole shareholder of Ourse (USA), Inc.) for it to be effective and the transfer of assets to occur.

3. B.I.G. must provide notification to OURSE that B.I.G. or a related party has acquired all the rights of Citibank with respect to its secured loan against the assets of Jacaranda, S.A., a Bolivian corporation. This Agreement shall become null and void in its entirety if the Citibank transaction is not completed and the loan acquired by B.I.G. or related parties at a reasonable time from the date of the execution of this Agreement. B.I.G. is specifically aware that the contemplated shareholder meetings of OURSE and Mara Holdings Overseas, Ltd. will not be held until the Citibank transaction is completed.

4. B.I.G. shall take all necessary actions so that Maxine Williams will no longer be a guarantor of the credit card and BOALC loans at the time that the transfer of assets becomes effective. Should Maxine Williams remain as guarantor of the obligations after the shareholder approval of the transfer of all assets to B.I.G., B.I.G. will then provide Maxine Williams with a lien against all inventory in order to further guarantee the release of the guarantees.

5. Following the signing of this Agreement and the transfer of management control to B.I.G. a designees and until such time as the transfer is approved by the shareholders, B.I.G will provide timely information to Marcelo Vasquez and Maxine Williams as to the payments made.

6. B.I.G., immediately upon the execution of this Agreement and prior to receiving any OURSE funds or assets under any of the terms of this Agreement, shall provide funds necessary to restart production at the Jacaranda facility.

**V. MANAGEMENT CONTROL** — (A) Pending the occurrence of the conditions precedent stated in section IV above, and immediately upon the execution of this agreement by all parties the parties agree to a transfer of management control as set forth herein.

(B) In order to induce B.I.G. to enter into the Agreement for the Sale and Transfer of Assets so that B.I.G. can be assured that the assets of OURSE will not dissipate and the obligations to be assumed by B.I.G. will not increase in amount during the process of waiting for shareholder approval, OURSE does hereby grant B.I.G. the right to name the management team of OURSE, which management team shall have all rights and responsibilities with respect to the operations of OURSE and the management of its

accounts. OURSE agrees to turn over to B.I.G. s selected designee signature authority over all banking accounts currently belonging OURSE and further agrees to open no additional banking accounts without the express written approval of B.I.G. s designee.

(C) The parties agree that all receipts, whether cash sales receipts, receipts in the payment of accounts receivable and/or any other monies received by OURSE shall be deposited to the accounts controlled by B.I.G. s designee. All deposits received shall be used strictly for the benefit of OURSE to meet its ongoing business obligations and debts.

(D) B.I.G. s management designee(s) shall have full operational authority over OURSE.

(E) OURSE understands that in its current financial state that it cannot finance its ongoing operations and risks being unable to comply with outstanding orders. Should B.I.G. agree to provide financing directly or indirectly to JACARANDA S.A. or any other OURSE supplier so that OURSE can obtain goods to meet outstanding orders and should B.I.G. request OURSE to do so, OURSE does hereby agree to transfer to B.I.G. ownership of OURSE open orders and the accounts receivable generated thereby, as well as all current and future Accounts Receivable and Inventory of OURSE as security for any financing or goods provided by B.I.G.. Under this premise B.I.G. would become the owner of the opens orders, accounts receivable and inventory in exchange for providing financing. However, the officers of OURSE shall have the power to assign the rights of collection of individual accounts receivable if the B.I.G. financing is directly related to said accounts.

(F) Furthermore, in the event that B.I.G. does provide financing directly or indirectly to JACARANDA, S.A. to produce for OURSE resulting in the above mentioned transfer of purchase orders, accounts receivable and inventory, OURSE does hereby further grant to B.I.G., until such time as all B.I.G. financing is recovered by B.I.G., the right to use the OURSE trademarks, logos and emblems in a business like manner that will not diminish the goodwill associated with said trademarks, logos, and emblems.

(G) If the conditions contained in section IV have not occurred within six (6) months of the date of the execution of this Agreement or the shareholders of either OURSE or Mara Overseas Holdings, Ltd. specifically reject this agreement, then the management control provisions of this section shall cease and the management control shall revert to OURSE. Provided, however, that provisions shall be made as contemplated herein for the repayment of all financing provided by B.I.G. during this period.

**VI. HEADINGS** — All paragraph and section headings contained herein are for informational purposes only and do not control or limit the interpretation of the words contained therein.

**VII. ATTORNEY S FEES AND COSTS** — All parties hereby specifically agree that if any legal proceedings are instituted under the terms of this agreement, the prevailing party shall be entitled to recover their attorney s fees and all costs of the legal proceedings from the non-prevailing party. Said fees shall include, without limitation, all attorney s fees incurred in any and all alternative dispute resolution forums (including arbitration and mediation), trial courts, and appellate proceedings. For purposes of this section, all parties includes, in addition to the primary parties B.I.G. and OURSE, Maxine Williams and Marcelo Vazquez.

**VIII. CHOICE OF VENUE**— All parties to this agreement specifically agree that if any legal proceedings are brought concerning this agreement they shall be brought in the court of competent jurisdiction located in Miami-Dade County, Florida. For purposes of this section, all parties includes, in addition to the primary parties B.I.G. and OURSE, Maxine Williams and Marcelo Vazquez.

**IX. CHOICE OF LAW** - All parties to this agreement specifically agree that if any legal proceedings are brought concerning this agreement then the laws of the State of Florida shall be exclusively applied to those proceedings. For purposes of this section, all parties includes, in addition to the primary parties B.I.G. and OURSE, Maxine Williams and Marcelo Vazquez.

**X. ENTIRE AGREEMENT** — The Agreement contained herein is the full and complete agreement of the parties to this matter.

**XI. AMENDMENTS** — Any and all amendments to the terms of this Agreement shall be in writing and signed by all parties in order to be effective.

**XII. TIME OF ESSENCE** - Time is of the essence with respect to every provision herein.

**XIII NUMBER AND GENDER** — In this Agreement the singular shall include the plural and the masculine shall include the feminine and neuter gender, and vice versa, if the context so requires.

**XIV. NOTICE** — Any and all notices referred to herein shall be sufficient if furnished in writing and sent by certified mail via the United States Postal Service to the parties at the permanent mailing addresses indicated herein.

**XV. ASSIGNMENTS** — The rights and benefits to the parties under this Agreement are exclusive to the parties and are not freely transferable. Any and all assignments must be agreed to in writing by all parties to this agreement.



**XVI. EFFECT OF WAIVER** — The waiver by any party of a breach of any provision of this Agreement shall not operate as or be construed as a waiver of any subsequent breach of it.

FROM : JPOURSE                FAX NO. : 3052349097        Nov. 07 2005 02:49PM P6
Case 1:07-cv-06337-VM-RLE    Document 1    Filed 07/11/2007    Page 17 of 25
05  11:50 FAX 702 9464406      PARIS LV BUSINESS CTR #2                    002

SBE                          FAX NO. : 3052349097        Jan. 28 2005 01:05PM P7

**XVII. SEVERABILITY** - If any clause of this agreement is found to be in violation of any law of the United States (including all applicable state or federal laws), the British Virgin Islands, or Bolivia, then that provision shall be severed and the remaining provisions shall remain in full force and effect.

**XVIII. FAXED ORIGINALS** — The parties agree that signed faxed copies of this Agreement shall be treated as originals and hereby given the same full force and effect of originals. Due to the distance between the parties, individual exact copies of this document may be executed by the parties and faxed to the other parties. The terms of this Agreement shall be in full force and effect when all parties have exchanged signed exact copies whether or not all signatures appear on the same copy.

OURSE (USA), Inc.

Witness
Print Name: KAREN VICTORIA

Maxine Williams, President

Witness
Print Name: KAREN VICTORIA

Marcelo Vasquez, Vice-President

BOLIVIAN INVESTORS GROUP, INC.

Witness
Print Name: Joseph J. Burchette

John C. Bays, President

**EXHIBIT C**

**From:** JOHNBAYS@aol.com
**Date:** Tue, 29 Nov 2005 21:12:00 EST
**To:** nanci@jpourse.com
**Cc:** evelarde@jandj-industries.com, JMBays@aol.com, Kcbays1@aol.com,
Gar0054@aol.com
**Subject:** Going Forward


Dear Nanci,

In follow-up of management meetings and the closing of the Miami office, Eduardo and I met with you on November 15 and presented terms for your future involvement in representing the JP Ourse and John Cole Collections lines of products, given the current situation. We have not received any feedback from you with respect to the proposals outlined in our conversation of November 15. Due to the fact that December 1 is fast approaching, I have been asked to reiterate the general conditions under which management will consider you as its Independent Sales Representative:

1. Starting with the month of December (Thursday) you will only receive monthly commissions on sales that are generated and collected, net of any returns for the corresponding month or any preceding month as well as net of sales taxes, shipping charges and other service items.
2. Starting with the month of December (Thursday) you will not receive a monthly consulting fee.

3. Your commission will be 5% of the gross sale amount of product (including discounted items, so long as all pricing for product is approved by management) to clients assigned to you (the current list of clients assigned to you plus those assigned in the future as a result of your direct effort). The commission will be paid on the gross sales amount of product after deducting discounts, any sales tax, shipping charges and any other service items that may be included in the sale.
4. As an additional amount, you will receive a 2% incentive commission on collected sales during the month (net of returns, discounts, taxes and services) to your assigned accounts. The maximum you may ever accrue under this offer is $80,000 and any amount that you do not accrue in 4 years from the date of December 1, 2005 will be forfeited. This clause has been designed in an effort to compensate your future efforts keeping in mind the fact that Ourse (USA), Inc. did not fulfill its obligations to you.
5. Should you fail to sell in any given three month period a minimum of $200,000 worth of product, your status as an Independent Sales Representative representing the JP Ourse and John Cole lines is subject to immediate termination at management's sole discretion and you will forfeit any and all of the benefits outlined above.
6. Should you reach a collected sales level exceeding $900,000 in any given calendar year, you will accrue an additional 1% on those collected sales. Should you cease representing the JP Ourse and John Cole lines at any time during the year after having reached the indicated sales level you will nevertheless be entitled to this additional 1% commission.
7. Should you decide not to accept these terms or should you leave at any time, whether by your own volition or the election of management, it is understood that you forfeit the above benefits (with the exception of paragraph 6 above) and that upon leaving you will only be paid commissions on generated and collected sales to the date of your departure.
8. You are free to use, but not required to do so, the New York showroom at 320 Fifth Avenue, Suite 420, NY, NY 10001 for such period of time as management deems it necessary to maintain that location. That showroom will continue to have one telephone line available for your use so long as your telephone charges do not exceed $200 per month.
9. It is suggested that you be in attendance at the New York Gift and New York Accessories shows to represent the products as well as any other shows that management suggests that you attend. Management will cover all show costs. Management will also cover your travel, lodging

and meal costs for shows outside of New York City for which you are suggested to attend.
10.  Starting December 2005 all 800 calls and faxed orders will be received directly and processed in Maryland.  You will be notified of orders taken on your assigned accounts in order to better communicate with the clients.

I ask that your review the above and acknowledge your acceptance by 5 PM EST on Wednesday, November 30, by faxing your acceptance to the attention of Eduardo Velarde at 410 272 8949.  Should you fail to acknowledge acceptance, management will take silence as a rejection.

We look forward to working with you.

Very truly yours,

John C. Bays

**EXHIBIT D**



## J.P. OURSE & CIE.

**Fine Leather Goods**
**320 Fifth Avenue • Suite 409 • New York • New York • 10001**
**212.736.6655 t • 212.736.7373 f**
**1.888.OURSE NY • www.jpourse.com**

| | |
|---|---|
| **Date:** | December 19, 2005 |
| **To:** | John C. Bays and B.I.G. |
| **Re:** | Finalization details |

Dear John, Eduardo, Kay, Jim, Ed and Jess:

From your e-mail of December 14, I am left with the impression that you believe I accepted your offer concerning my compensation package which was outlined in our meeting on November 15 and confirmed in writing by e-mail on November 30. Please let me be clear, I did not accept your offer. In my response to you by both e-mail and fax on November 30, I stated "I find I am unable to accept this offer." I have continued working for Ourse because I understood from your communications that continued negotiation of my compensation going forward was still possible, but I now understand from your delays, your lack of response, and your December 14 e-mail that true negotiation is no longer possible.

You give me no choice but to conclude that you have effectively terminated my position, for the following reasons: (1) Your November 30 offer effectively eliminated my compensation and benefit package, and changes my status to subcontractor; (2) You have consistently and repeatedly refused to address my requests for a reasonable offer; (3) You have demoted me from Vice-President of Sales and Marketing to Northeast Sales Representative. As I said in previous e-mails, this process has been going on since November 15, and I am unable to wait until after the week of December 26 to further discuss reaching an agreement for a compensation package going forward and a mutually agreeable arrangement regarding my back commissions. I have given you ample opportunity to better your unacceptable offer, which – based on my existing compensation and history with the company – is actually insulting; you have not done so.

Let me clarify, your offer is not acceptable because it eliminates my salary and benefits, but provides nothing to offset the reduction; it leaves my commission rate at its existing level, less retail web sales. Furthermore, regarding the $80,000 in back commissions which I have earned, which are due, and which you acknowledge, your offer of 2% against sales going forward for four years as compensation is not acceptable because there is no good faith sum up front, which I had expected, and it is highly unlikely I will be able to collect

anywhere near $80,000 within four years based on current production capacity, sales and shipping. In response to your e-mail of December 14, I must take into consideration my history with the company, which has certainly taught me that I cannot depend on the company's revenue growing as a guarantee that the full $80,000 will be repaid in full or even that the company's revenue will remain at present levels. I also cannot help considering the fact that you have eliminated almost the entire support staff, and I would be working without a contract. Finally, receiving even a portion of this money should not depend on future sales, as this money represents commissions already earned from sales completed some time ago, which had kept both Ourse and Jacaranda running.

Another negative aspect to your proposal is the unexpected change of status to independent contractor, and the corresponding increase in tax liability. Firstly, I have been informed that under New York State law, a captive commissioned salesperson cannot be an independent contractor; as a result, your proposal is not consistent with the law. Moreover, after ten years with Ourse, I feel I am entitled at least to the benefit package I have now. Due to my longevity with the company, I also feel I am entitled to have a sense of both job and financial security. Since the change of management in August, the sudden termination of all of the other employees, and the effort I have had to make and the difficulties I have had to endure to be paid for my work, I have no sense of security, financial or otherwise. The changes in my job description, the reduction of my areas of responsibility and the demotion to Northeast Sales Representative from Vice-President of Sales and Marketing make my job less creative. I no longer feel I am a part of a team where my input is valued. In fact, I feel I am being kept out of the loop, and have little idea of your plans for the company.

As no new agreement has been made concerning my compensation, I fully expect to be paid under my existing relationship with the company. This includes my compensation of $155.00 per day for the eight days worked through December 14 or a total of $1240.00, which was my last day in the office. Please note that I have continued to work for Ourse since November 30 on the basis that we were bargaining in good faith and that the existing arrangement would be continued until a new compensation arrangement was mutually agreed to.

I have contacted an attorney so that I can better understand my rights under the law. If it is required, I will have my attorney takes such steps as are necessary to ensure that my rights are protected.

Of course, I will help to tie up any loose ends. To be as clear as possible, I have outlined the final details concerning the consequences of your constructive termination of my position below.

**Commission and Shipping Reports:** I will expect a shipping/commission report to be sent to my home on a monthly basis reflecting orders from my

2

accounts, or that I generated, their ship dates, and the shipped totals, less any returns. This report should be sent with a check that reflects 5% commission of wholesale orders written, and through December 14 will also include all JPO.COM and Ebags retail orders to which I am entitled.

I realize you may still be compiling this data; I can wait a short time until you can produce these reports. I expect to be commissioned on all orders I generated up until my last day worked which was December 14, 2005. There will be commissionable orders shipping in December, January, February, March, and April, which is the last open Orvis purchase order.

I am informed that New York State law dictates that commissions must be paid in a timely manner regardless of whether I am continuing to work for your company and that I am entitled to a statement of earnings due and unpaid upon request. Please consider this a written request for my total due and unpaid commissions on a monthly basis. You should send this information to my home address at 238 East 84th Street, Apartment #3D, New York, NY 10028.

**Back Commissions:** As to a mutually agreeable arrangement regarding the $80,000 in back commissions owed to me and acknowledged by you in the purchase agreement, we have not yet reached an agreement which is either mutual or agreeable.

Your 2% offer depends on sales going forward, whereas the $80,000 represents commission on sales earned in the past that kept Jacaranda and Ourse in business. I was led to expect that when you took over we would come to a mutually agreeable arrangement concerning this money. There was no stipulation that I would be required to continue to work for you for any period of time to receive any portion of this, and I am unwilling to become some sort of indentured servant to ensure I receive money that I have already earned and that you acknowledge you owe to me. Based on the agreement you signed, I ask that you begin with a good faith sum. Although you carefully avoided discussing this with me in a direct manner in the past year, you certainly implied in your e-mails and conversation that it would be addressed as per the agreement.

**Upcoming Trade Shows:** I have made notations in the set-up manuals and will send them to Maryland office for the Accessories Show, the NY Gift show and WWIN show. As you know the NY Gift show set-up manual can be accessed online at www.glmshows.com, the user name is "nancifel" and the password is "nyg5216". I e-mailed all other show contact information to Kay previously, and am willing to resend it if you require.

**Showroom:** There are three keys to the showroom. I have one key, and I will it to send to you. As per building rules, the Superintendent also has one key, and Mike Volza of Mele Jewel Boxes has one key.

3

If there will be any difficulty with Mele Jewel Boxes using the showroom for at least one meeting in January, please let me know and I will contact Mr. Volza. As noted above, he has a key and can let himself in.  Mr. Volza's cell phone is 315.269.7546.  I believe they have been mailing their monthly check directly to the Maryland office since November; if the checks have not been received, kindly let me know and I will contact them.

You will want to notify people coming to the showroom of your contact information, if you continue to maintain the space.  If you are going to close the showroom or leave it unstaffed, the mail should be forwarded.  If you need assistance with this, I am willing to make a sign with your contact information for the showroom door and to have a forwarding order entered with the Post Office.

**Verizon:**  Verizon is the service provider for the telephone, fax and toll-free lines.  You can either terminate the telephone, fax and toll-free lines or have them redirected to the Maryland office.  If you need assistance with this, I am willing to help.  The billing address has already been changed so that the bills are sent directly to the Maryland office.

**Earthlink DSL and nanci@jpourse.com:** I have been paying Earthlink for DSL service since the end of October 2005.  I plan to cancel the office DSL as I will need to send the modem back to them.  The cost is $44.95 per month. At current, I am not seeking reimbursement of the $89.90 for the past two months, but reserve the right to do so at a later date.  As I no longer have access to the Ourse mail server, I cannot put a forward or auto-reply message on my own e-mail.  However, if anyone contacts me for a business purpose by mail, e-mail, or telephone, I will inform them that I am no longer working for the company and provide them with your contact information.

Please advise me if you need my assistance with mail, telephones, and other matters noted above.  I will need to hear from you within the next week regarding the financial issues.  November commissions are due December 30, and I would imagine you will have all data compiled by that time; I expect you to forward that data to me as soon as it becomes available, and I expect to be paid within five days after the 30th of the month.

If you need to contact me, you can do so by e-mail or by telephone; my e-mail is nancifel@earthlink.net.  I am disappointed we could not reach a mutually agreeable arrangement for my continued employment, and I wish you luck in your new endeavor.

Best regards,

Nanci Feldman
238 East 84th Street, Apartment #3D
New York, NY 10028
nancifel@earthlink.net

4